IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Treli S. S.,[1] | ) | C/A No.: 1:22-3017-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Martin O'Malley,[2] | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable R. Bryan Harwell, United States District Judge, dated September 8, 2022, referring this matter for disposition. [ECF No. 4]. The parties consented to a United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 3].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Martin O'Malley was confirmed by the Senate and sworn in as Commissioner of the Social Security Administration on December 20, 2023. Pursuant to Fed. R. Civ. P. 25(d), he is substituted for Kilolo Kijakazi as a party to this action.

Commissioner of Social Security ("Commissioner") denying the claim for disability insurance benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the court affirms the Commissioner's decision.

I.     Relevant Background

A.     Procedural History

On June 29, 2017, Plaintiff protectively filed an application for DIB in which he alleged his disability began on January 25, 2017.[3] Tr. at 99, 171–75. His application was denied initially and upon reconsideration. Tr. at 100–03, 110–15. On April 3, 2019, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Edward Morriss. Tr. at 34–60 (Hr'g Tr.). The ALJ issued an unfavorable decision on August 29, 2019, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 12–33. Subsequently, the Appeals Council denied Plaintiff's request for review. Tr. at 1–6.

Thereafter, Plaintiff brought an action seeking judicial review of the Commissioner's decision in *Treli S. S. v. Commissioner of Social Security*, C/A No. 8:20-2752-RBH-JDA (D.S.C.). On September 7, 2021, then-United States Magistrate Judge Jacquelyn D. Austin issued an order reversing the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g), and

---

[3] Plaintiff filed a second application on August 6, 2020. Tr. at 1271–72. The two applications were consolidated prior to the most recent hearing.

remanding the case to the Commissioner for further administrative proceedings. Tr. at 1065–90.

Plaintiff appeared before ALJ Richard LaFata for a second hearing on June 1, 2022. Tr. at 970–1034. (Hr'g Tr.). The ALJ issued a partially-favorable decision on July 1, 2022, finding Plaintiff was disabled for a closed period from January 25, 2017, through June 21, 2018, but was no longer under a disability.[4] Tr. at 929–69. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on September 7, 2022. [ECF No. 1].

### B. Plaintiff's Background and Medical History

#### 1. Background

Plaintiff was 41 years old at the time of the first hearing. Tr. at 38. He completed high school. Tr. at 41. His past relevant work ("PRW") was as a truck driver. Tr. at 979–80. He alleges he has been unable to work since January 25, 2017. Tr. at 172.

#### 2. Medical History

Plaintiff was transported to Grand Strand Regional Medical Center by helicopter on January 25, 2017, following a rollover motor vehicle accident

---

[4] The ALJ's decision permitted Plaintiff 30 days to file written exceptions with the Appeals Council. Tr. at 929. It indicated that if Plaintiff declined to file written exceptions within the 30-day period, the ALJ's decision would be considered administratively-final, and Plaintiff would have the opportunity to file a civil action in federal district court. Tr. at 930.

("MVA") in which he was the unrestrained driver extricated from a logging truck. Tr. at 275, 280. His diagnoses included concussion with loss of consciousness, right front skull fracture extending to the frontal sinus, medial orbital wall fracture and nasal bone fracture, clavicle fracture, acute pain due to trauma, and history of obstructive sleep apnea ("OSA") with use of at-home continuous positive airway pressure ("CPAP"). *Id.* He was discharged on February 2, 2017. Tr. at 276, 279.

Plaintiff was subsequently admitted to Waccamaw Community Hospital from February 8 to February 21, 2017, for treatment of ongoing functional deficits and medical concerns related to his closed traumatic brain injury ("TBI") with loss of consciousness and morbid obesity with a body mass index ("BMI") of 47. Tr. at 390, 392. He was discharged with home health, including physical, occupational, and speech therapy, nursing services, and an aide. Tr. at 391.

Nurses' aides, skilled nurses, and occupational and speech therapists provided services in Plaintiff's home from February 24, through March 21, 2017. Tr. at 683–769.

Plaintiff presented to his primary care physician, Henry G. Adkins, M.D. ("Dr. Adkins"), for hospital follow up on March 7, 2017. Tr. at 480. He reported ability to ambulate about 100 feet with his quad cane, but most often using a wheelchair. *Id.* Dr. Adkins noted diagnoses of hypertension,

4

obesity, diabetes mellitus, TBI, and OSA with use of CPAP. *Id.* He observed dysfunction on motor exam and abnormal gait and stance with ambulation, requiring a quad cane. Tr. at 481. He prescribed Clonidine HCl 0.1 mg, Norco 10-325 mg, Avapro 300 mg, Diclofenac Sodium 75 mg, Metformin 1000 mg, Neurontin 300 mg, and Procardia XL 90 mg and instructed Plaintiff to follow up in three months. Tr. at 482.

Plaintiff presented to nurse practitioner Kathryn R. Hamilton ("NP Hamilton"), for hospital follow up on March 8, 2017. Tr. at 438. He described right shoulder pain, occasional blurred vision, and dizzy spells that lasted for five to 10 seconds at a time and resolved on their own. *Id.* NP Hamilton noted Plaintiff was doing well overall. Tr. at 439.

Plaintiff also presented to James C. Butler, M.D. ("Dr. Butler"), on March 8, 2017, for evaluation of his right shoulder. Tr. at 452. Dr. Butler observed very limited range of motion ("ROM") of the right shoulder with forward flexion to 100 degrees, external rotation to about 30 degrees, and internal rotation to the sacroiliac joint. *Id.* He noted enlargement along the medial head of the right clavicle, but no significant point tenderness. *Id.* He assessed a healing fracture of the medial clavicle/clavicular head at the sternoclavicular joint, and adhesive capsulitis of the right shoulder. *Id.* He planned to contact Plaintiff's physical therapist to instruct on aggressive ROM protocol. *Id.*

On April 19, 2017, Plaintiff reported he had not yet been scheduled for outpatient physical therapy, but had some slight improvement in his shoulder motion. Tr. at 450. Dr. Butler observed very limited active and passive ROM of the right shoulder with slightly improved internal rotation to 30 degrees, forward flexion to 100 degrees, abduction to 80 degrees, and internal rotation to L4. *Id.* He noted a healed medial third clavicle fracture. *Id.* He referred Plaintiff to physical therapy for frozen shoulder protocol. Tr. at 451.

Plaintiff presented to Three Rivers Therapy Associates for an initial evaluation for right shoulder adhesive capsulitis on April 26, 2017. Tr. at 602. Physical therapist Stacey Lawrimore Howell ("PT Howell") recorded Plaintiff's right shoulder active ROM as follows: flexion to 54/180 degrees; abduction to 64/180 degrees; internal rotation to 38/70 degrees; and external rotation to 34/90 degrees. Tr. at 603. She assessed right shoulder passive ROM as follows: flexion to 91/180 degrees; abduction to 95/180 degrees; internal rotation to 48/70 degrees; and external rotation to 39/90 degrees. *Id.* Plaintiff also demonstrated impaired active and passive ROM of the right elbow. *Id.* PT Howell assessed constant right shoulder pain up to 6/10, decreased active and passive ROM of the right shoulder in all planes, decreased active ROM to right elbow extension, decreased active ROM on the right to scapular elevation/retraction, and decreased core on the shortened

version of the Disabilities of the Arm, Shoulder, and Hand ("QuickDASH") outcome measure. Tr. at 604. Plaintiff participated in at least 34 physical therapy sessions through August 23, 2017. Tr. at 521–608.

On May 11, 2017, Plaintiff presented to Joseph Cheatle, M.D. ("Dr. Cheatle"), for a two-month follow up. Tr. at 436. He reported dizziness that had started the prior week, but had improved significantly. *Id.* Dr. Cheatle noted Plaintiff was having problems with walking and was dragging his right foot. *Id.* He indicated Plaintiff was scheduled for a computed tomography ("CT") scan. *Id.* He noted that if the CT scan was negative, he would order magnetic resonance imaging ("MRI") of Plaintiff's brain and lumbar spine. *Id.* The CT scan of the brain was normal. Tr. at 442.

On May 31, 2017, Plaintiff endorsed continued pain due to adhesive capsulitis. Tr. at 448. Dr. Butler observed passive forward flexion of the right shoulder to 140 degrees, abduction to 110 degrees, external rotation to 45 degrees, and internal rotation to L2. Tr. at 449. He stated Plaintiff had shown clinical improvement in his adhesive capsulitis with physical therapy and home exercises. *Id.* He advised Plaintiff that his pain would likely resolve if his ROM were restored and instructed him to continued physical therapy two to three times per week and home exercises up to three times per day. *Id.* He imposed "[l]ight duty sedentary restrictions with no lifting right upper extremity." *Id.*

Plaintiff complained of significant memory problems, forgetfulness, and episodic staring spells on June 21, 2017. Tr. at 517. Dr. Cheatle ordered awake and drowsy electroencephalograms ("EEGs") and an MRI of the brain. Tr. at 518.

On June 29, 2017, an MRI of Plaintiff's brain showed a focus of signal abnormality within the left central and peripheral pons with some mild volume loss. Tr. at 440. The radiologist considered the volume loss as likely more apparent than real and likely of microangiopathic origin, perhaps related to Plaintiff's diabetes or hypertension. *Id.* He also noted a few tiny nonspecific white matter hyperintensities in the right cerebral hemisphere that were also likely of microangiopathic origin. *Id.*

On July 12, 2017, Plaintiff demonstrated the home physical therapy exercises he was using for his shoulder, and Dr. Butler noted that he was performing them properly. Tr. at 447. Dr. Butler indicated Plaintiff had not made much progress with ROM. *Id.* He recorded forward flexion to 140 degrees, passive abduction to 100 degrees with pain, external rotation to 45 degrees, and internal rotation to L4. *Id.* He assessed adhesive capsulitis of the right shoulder with no significant improvement in ROM. *Id.* He administered a Celestone and Lidocaine injection, instructed Plaintiff to continue stretching exercises, and indicated he was to remain on "light duty sedentary restrictions with no lifting right upper extremity." *Id.*

8

On August 8, 2017, an EEG sleep study produced normal results. Tr. at 514.

On August 24, 2017, Plaintiff complained his right shoulder felt worse since the injection. Tr. at 652. Dr. Butler noted Plaintiff's pain persisted with passive and active ROM. *Id.* He recorded right forward elevation to 140 degrees, abduction to 120 degrees, external rotation to 45 degrees, and internal rotation to L4. *Id.* He assessed persistent adhesive capsulitis, despite aggressive physical therapy and injection therapy. *Id.* Plaintiff indicated a desire to proceed with manipulation under anesthesia, and Dr. Butler ordered an MRI prior to scheduling the procedure. *Id.*

On August 30, 2017, Plaintiff presented to licensed clinical psychologist L. Randolph Waid, Ph.D. ("Dr. Waid"), for a neuropsychological evaluation. Tr. at 626–33. Dr. Waid noted reports that Plaintiff "continue[d] to experience compromise in attention/memory as well as episodes of confusion," was "transposing letters when spelling," was "los[ing] his train of thought and experienc[ing] other executive deficits," was "experiencing increased emotional reactivity including an easier anger as well as episodes of dysphoria," and was "having illusionary experiences as well as misidentification of objects in space." Tr. at 627. He further acknowledged indications of Plaintiff's difficulties with gait, slow ambulation with a cane, frozen/limited ROM of the right shoulder, poor balance, episodes of dizziness,

blurred vision, paresthesia occasionally affecting the fingertips and neck, and right shoulder pain. Tr. at 627–28.

Dr. Waid administered the Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV"), Wechsler Memory Scale, Fourth Edition ("WMS-IV"), Stroop Test, Brief Test of Attention, Judgment of Line Orientation Test, Conners' Continuous Performance Test–II, Trail Making Test, Controlled Oral Word Association Test, Category Fluency Test, Seashore Rhythm Test, Speech Sounds Perception Test, Behavior Dyscontrol Scale, Word Choice Test, Test of Memory Malingering ("TOMM"), Personality Assessment Inventory ("PAI"), and Frontal System Behavior Scale (Self and Family Report Forms). Tr. at 629. He found no evidence of receptive language dysfunction and no imperceptions or suppressions affecting the auditory, visual, or tactual modalities. Tr. at 630. He noted positive Romberg test and decreased grip strength of the right upper extremity. *Id.*

Dr. Waid explained the test results as follows:

Neuropsychological evaluation revealed Mr. S[] to demonstrate difficulties effectively sustaining attention/concentration with slow mental/psychomotor processing speed. Yet, Mr. S[] was generally able to meet the demands of working memory tests. Mr. S[]'s performance on a continuous visual processing test was revealing of attentional problems. Assessment of anterograde memory provided viable results though Mr. S[] was generally able to effectively encode and immediately learn information. Mr. S[] also demonstrated a generally adequate ability to retain and recall information once it was effectively encoded/learned. There was variable performance on tests assessing visual spatial/perceptual reasoning abilities. Receptive and expressive

language functioning was generally intact. Evaluation of sensory perceptual functioning revealed intact functioning though there was report by Mr. S[] of experiencing illusions in his peripheral space. Mr. S[] was generally able to meet the demands of tests assessing higher reasoning/problem solving abilities. Mild executive dysfunction appeared to be present affecting both cognitive and emotional domains.

Assessment of emotional/behavioral functioning revealed Mr. S[] to continue in a recovery process including need for follow up as it might relate to "staring off episodes." Clearly, Mr. S[] is having to cope with residual pain and somatic symptoms. There was also report of sleep disturbance, diminished energy as well as cognitive impairments affecting his thinking and concentration skills. Mr. S[] is more emotionally reactive with increased irritability and an easier anger.

Tr. at 633. He diagnosed mild neurocognitive disorder due to TBI and depressive disorder. *Id.*

On September 6, 2017, an MRI of Plaintiff's right shoulder showed new focal full-thickness tearing of the distal-most supraspinatus tendon with superimposed diffuse moderate underlying tendinopathy; persistent significant hypertrophic degenerative changes of the right acromioclavicular ("AC") joint consistent with an underlying impingement-type syndrome with diffuse edema and inflammation surrounding the entirety of the AC joint; type 3 down-sloping acromion; diffuse bursitis in the subacromial/subdeltoid bursa; and no significant joint effusion. Tr. at 653. It also revealed severe end-stage degenerative changes of the right glenohumeral joint space with subchondral cyst formation in the underlying glenoid and medial humeral

11

osteophytosis most compatible with grade-4 chondromalacia, as well as degenerative fraying of the labrum. Tr. at 654.

Plaintiff returned to Dr. Butler for MRI follow up on September 18, 2017. Tr. at 650. Dr. Butler noted Plaintiff had end-stage degenerative arthritis of the right glenohumeral joint. *Id.* He recommended an intra-articular injection under fluoroscopy. *Id.* Christopher C. Feathers, M.D. ("Dr. Feathers"), administered a shoulder injection on October 6, 2017. Tr. at 648.

On October 25, 2017, Dr. Butler noted active elevation of Plaintiff's right shoulder to 100 degrees with pain, passive elevation to 120 degrees, external rotation to 45 degrees with crepitus and pain, and internal rotation to L3 with pain. Tr. at 647. He explained that Plaintiff was not a good candidate for rotator cuff repair, given his pre-existing degenerative arthritis. *Id.* He considered Plaintiff to have reached maximum medical improvement ("MMI") and assessed a 12% impairment rating to his right shoulder. *Id.* He encouraged Plaintiff to wean off Hydrocodone and imposed permanent restrictions of no overhead use of the right upper extremity and no lifting greater than 20 pounds with the right upper extremity. *Id.*

Plaintiff presented to Alain Lekoubou Looti, M.D. ("Dr. Looti"), for a consultative medical evaluation on November 4, 2017. Tr. at 635–38. He reported using a quad cane to ambulate, participating in rehabilitation for his frozen shoulder, continued pain in his right shoulder, remote and short-

term memory issues, "being slow," "sometimes jumbling words," and difficulty sleeping. Tr. at 635–36. Dr. Looti observed Plaintiff to be alert and oriented times four and able to recall two of three words in one minute and the third after cueing, to demonstrate fluent language, and to have normal copying. Tr. at 636. He noted normal ROM, except for the right shoulder, tenderness to palpation in the right shoulder, absent Romberg sign, use of a cane for ambulation, antalgic gait, and inability to squat, tandem walk, heel walk, and toe walk. Tr. at 637–38.

Plaintiff presented to Gene Sausser, Ph.D. ("Dr. Sausser"), for a consultative psychological evaluation on December 7, 2017. Tr. at 640–42. Dr. Sausser observed Plaintiff to have normal mood, broad affect, and orientation to person, place, and time. Tr. at 641. He noted Plaintiff remembered two of three words after five minutes and completed serial sevens forward at a relatively fast pace and backwards at a moderate pace. *Id.* He stated Plaintiff remembered five digits forward and four digits in reverse. *Id.* He indicated Plaintiff worked at an intermediate level on general information and similarities questions on the WAIS-IV and displayed no difficulties in attention and concentration. *Id.* He noted Plaintiff's reasoning and judgment abilities appeared to be intact. *Id.* He considered Plaintiff to have adequate immediate and short-term memory, but difficulty with long-term memory. *Id.* He stated Plaintiff had no difficulties in thought processing or thought

content, no evidence of psychosis, and good insight and impulse control. Tr. at 642. Plaintiff denied performing household chores, driving, and managing finances and said he required his wife's assistance in putting on his socks, shoes, and shirts. *Id.* Dr. Sausser indicated Plaintiff had some problems in concentration as it related to memory and was persistent and worked at a good pace. *Id.* He assessed mild neurocognitive disorder. *Id.* He stated Plaintiff was "most likely intellectually capable of managing funds." *Id.*

On December 11, 2017, state agency medical consultant Stephen Wissman, M.D. ("Dr. Wissman"), reviewed the evidence and assessed Plaintiff's physical functional capacity assessment ("RFC") as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, and crouch; never crawl; never reach overhead with the right upper extremity; and avoid even moderate exposure to hazards. Tr. at 71–73.

On December 13, 2017, state agency psychological consultant Blythe Farish-Ferrer, Ph.D. ("Dr. Farish-Ferrer"), reviewed the evidence and completed a psychiatric review technique ("PRT") in which she considered Listing 12.02 for neurocognitive disorders. Tr. at 68–69. She found Plaintiff

14

was moderately-limited in his abilities to understand, remember, or apply information and concentrate, persist, or maintain pace and mildly-limited in his abilities to interact with others and adapt or manage oneself. Tr. at 68. She completed a mental RFC assessment in which she noted Plaintiff was moderately limited with respect to the following abilities: to understand and remember detailed instructions; to carry out detailed instructions; and to maintain attention and concentration for extended periods. Tr. at 74–75.

Plaintiff presented to clinical physician assistant Lydia J. Cote ("PA Cote") on January 16, 2018. Tr. at 841. He described vertigo secondary to changing positions, and his wife described an incident two weeks prior during which he had been speaking, started staring, and subsequently resumed speaking. *Id.* PA Cote noted Plaintiff's EEG was normal. Tr. at 842. She referred Plaintiff to a neurologist for evaluation of vertigo and seizure-like activity and instructed Plaintiff not to drive. *Id.*

Plaintiff presented to C. Thomas Gualtieri, M.D. ("Dr. Gualtieri"), for an evaluation on February 7, 2018. Tr. at 822–30. Plaintiff reported severe problems with attention and pain, moderate problems with poor memory, sleep, and fatigue, and symptoms of dizziness, vertigo, fatigue, diarrhea, constipation, joint pain, arthritis, severe shoulder pain, and inability to sit or stand for long periods. Tr. at 822. Dr. Gualtieri explained his findings as follows:

On the computerized neurocognitive test, [Plaintiff's] verbal abilities were low average, but his visual reasoning skills were above average. He had significant problems on tests of processing speed and attention. Some of his scores were lower than we would ordinarily expect, considering the severity of his concussion. Motor speed and working memory were also low average. He did well on tests of verbal fluency and auditory verbal learning but was weak in visual memory. On the personality assessment inventory, some of the validity indicators fell outside of the normal range, suggesting that Mr. Sessions may not have answered in the completely forthright manner. He tended to portray himself as being relatively free of common shortcomings but somewhat reluctant to recognize minor fails. There was no evidence of effort to intentionally distort the profile. However, he also described unusual sensorimotor symptoms, unhappiness, disruptions in thinking, physical signs of depression and anxiety, tension and apprehension, moodiness, feelings of helplessness and preoccupation with his physical functioning. The profile was consistent with conversion disorder.

The results of the patient's testing today indicate mild encephalopathy, particularly evident in measures of processing speed. This is an ambiguous result, it could be the consequence of cerebrovascular small vessel disease. There is evidence of same on the MRI and the patient is overweight, hypertensive and diabetic. However, it might also be the result of the traumatic brain injury; however, I find it nowhere in the records that the patient was unconscious for a week. His earliest follow-up visits indicated normal neurological examination and his mental state was clear, although most of the examinations were done by ENTs and orthopedists. Nor do I find mention of left proptosis or right lower extremity weakness in the record. There are subtle indicators of exaggeration in the patient's symptom report, which could be the result of irritability, anxiety and depression related to chronic pain and disability or perhaps to TBI. There are no signs however of overt malingering. It's entirely possible that the patient's premorbid small vessel disease amplified the consequences of concussion, and that chronic pain and idleness are leading to irritability and depression. That construction would only be valid if the patient did in fact have a traumatic brain injury associated with prolonged [loss of consciousness] or amnesia.

Tr. at 822–23.

Plaintiff returned to Dr. Cheatle on March 2, 2018. Tr. at 835. He described difficulty remembering, veering to the right and falling when attempting to walk without a cane, and feeling hot and cold. *Id.* Dr. Cheatle planned to refer Plaintiff for cognitive and gait therapy, to a neurologist, and to Richard Osman, M.D., for evaluation of his visual complaints. Tr. at 836–40.

On March 5, 2018, Plaintiff reported having received no relief from the intra-articular injection. Tr. at 645. He complained of complications that included increased shoulder tightness and elevated blood sugar. *Id.* He rated his right shoulder pain as a three of 10 at rest and a six of 10 with motion. *Id.* Dr. Butler noted slightly improved ROM with passive elevation to 140 degrees, abduction to 130 degrees, external rotation to 60 degrees, and internal rotation to L1. Tr. at 646. He observed 5/5 strength, intact motor and sensory function, and positive Hawkins' sign. *Id.* Dr. Butler assessed a work-related right shoulder injury with a small supraspinatus rotator cuff tear and pre-existing degenerative arthritis. *Id.* He prescribed a topical cream and informed Plaintiff that he would have to lose 70 pounds to be eligible for shoulder surgery. *Id.*

Plaintiff participated in 12 speech therapy sessions between March 21, 2018, and May 2, 2018. Tr. at 787–805. His scores on the Ross Information

17

Processing Assessment ("RIPA") suggested his recent memory skills were impaired to the point that he needed constant cues to help him determine sequential information from ADLs. Tr. at 788. His reading comprehension was also moderately affected, and he often needed verbal and visual cues to help him determine the communication required in response. *Id.* He was encouraged to use a calendar to compensate for short-term memory deficits. Tr. at 787.

Plaintiff presented to David Stickler, M.D. ("Dr. Stickler"), for an independent medical exam on April 19, 2018. Tr. at 783–86. He reported the following symptoms: cognitive impairment to short-term memory and comprehension, mood impairment with depression and increased emotion, sleep impairment, vestibular impairment, and gait impairment. Tr. at 783. He indicated he was unable to perform activities of daily living ("ADLs"), including dressing/tying his shoes, showering, cooking, feeding himself, and driving. *Id.* Dr. Stickler reviewed reports from prior consultations and diagnostic tests and imaging. Tr. at 783–85. He noted the following abnormalities on physical exam: flat affect; antalgic gait; and 1+ reflexes in the lower extremities. Tr. at 785. He wrote the following:

> [Plaintiff's] first complaint, cognitive impairment, is complicated by the results of his neuropsychological testing. In one evaluation, he was felt to have a mild neurocognitive disorder and depressive disorder. The second evaluation also found mild impairment with subtle exaggeration of symptoms noted. It does

> not appear that these results are consistent with the greater level of impairment self-reported today.
>
> He is presently receiving vestibular therapy and continued therapy is indicated to address his persistent disequilibrium.

*Id.* Dr. Stickler's diagnostic impressions were post-concussive syndrome characterized by vestibular impairment, mild cognitive impairment (per neuropsychological testing), and sleep impairment. *Id.* He recommended Plaintiff continue gait therapy, receive interventions for sleep impairment, and be referred for a functional capacity evaluation ("FCE") to evaluate his ability to return to work. Tr. at 786.

Plaintiff participated in an FCE at Select Physical Therapy on June 12, 2018. Tr. at 807–20. He generally demonstrated the ability to function in the light physical demand category. Tr. at 807. He was able to lift up to 25 pounds from 10" to waist-level and 20 pounds from waist to shoulder-level; push 34 pounds and pull 50 pounds; constantly sit; frequently reach at desk level and overhead with the left upper extremity; frequently stoop, finger, handle, and grasp; and occasionally walk, climb stairs, and reach to floor level. *Id.* He was unable to balance, crouch, kneel, crawl, or perform an aerobic capacity test. *Id.* Physical therapist Colleen Volpe ("PT Volpe") observed Plaintiff to demonstrate an extremely slow gait pattern with a quad cane. *Id.* She noted that although Plaintiff was able to continuously walk for 22 minutes, his pace was so slow that it was not a functional gait that would

enable classification of a "frequent" tolerance. *Id.* She stated Plaintiff had poor balance, decreased right shoulder elevation for overhead reaching, and was unable to perform bimanual carry due to poor balance. *Id.* She indicated Plaintiff was unable to perform lifting from and reaching to floor level. *Id.* PT Volpe considered the results to be accurate, given Plaintiff's consistent performance, physiological responses, movement, and muscle recruitment patterns. *Id.*

On June 25, 2018, Dr. Gualtieri provided a report that was based on an assessment conducted on February 7, 2018, and a review of the FCE. Tr. at 821. He noted Plaintiff did not "appear to have changed much since his evaluation" in February and opined that "vocational efforts in the direction of light physical demand employment [were] indicated." *Id.* He stated: "Returning to work is usually the best rehabilitation." *Id.*

Plaintiff complained of slow mental status and a burning sensation and pain in his right shoulder on August 10, 2018. Tr. at 833. Dr. Cheatle reviewed the MRI of Plaintiff's brain and concluded it showed no signs of residual chronic brain injury, but some diabetic changes. Tr. at 834. He concluded no further neurosurgical interventions were available and instructed Plaintiff to follow up as necessary. *Id.*

A second state agency psychological consultant, Celine Payne-Gair, Ph.D. ("Dr. Payne-Gair"), reviewed the evidence and completed a PRT on

August 16, 2018. Tr. at 88–89. She considered the same listing and assessed the same degree of limitation as Dr. Farish-Ferrer. *Compare* Tr. at 68–69, with Tr. at 88–89. Dr. Payne-Gair completed a mental RFC assessment in which she found Plaintiff was moderately limited in the following abilities: understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and respond appropriately to changes in the work setting. Tr. at 94–96.

On September 7, 2018, a second state agency medical consultant, James M. Lewis, M.D. ("Dr. Lewis"), reviewed the evidence and assessed Plaintiff's physical RFC as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; occasionally push and pull with the right upper extremity; never crawl or climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs and kneel; frequently balance, stoop, and crouch; never reach overhead with the right upper extremity; and avoid even moderate exposure to hazards. Tr. at 91–94.

Dr. Waid provided a neuropsychological reevaluation report based on evaluations on September 27, and October 10, 2018. Tr. at 844–52. He summarized his findings as follows:

> The current evaluation revealed Mr. S[]'s intellectual functioning to be in the low average range which was consistent with that obtained in previous evaluation. In the current evaluation, Mr. S[] demonstrated weakness with regard to working memory and verbal comprehension abilities.
>
> Neuropsychological evaluation revealed Mr. S[] to experience lingering difficulties with attention/concentration and processing speed though his performance was improved compared to previous evaluation. There was variable performance on auditory working memory tests with Mr. S[] being able to meet the demands of a complex attentional test involving rapid multitasking. Evaluation of anterograde memory revealed variable results with regard to immediate learning/memory capacities as well as the ability to retain and recall information after it is effectively encoded/learned. Mr. S[] performed below average on a word list learning test. Evaluation continued to implicate compromise in the attentional/executive aspects of immediate learning/memory as contributing significantly to Mr. S[]'s complaints of forgetfulness in his day to day pursuits. It is also evident that functional factors such as pain and fatigue are contributing to compromise in immediate learning/memory capacities. Visual spatial/perceptual reasoning abilities were in the average range. There was no evidence of receptive or expressive language dysfunction. Sensory perceptual functioning was generally intact with Mr. Sessions complaining of less frequent experiencing of illusions in peripheral space. Motor functioning continues to be compromised including diffuse deconditioning, loss of strength affecting the right upper extremity, as well as mild balance difficulties as Mr. S[] utilizes a cane for assistance. Romberg testing conducted in the current evaluation was positive. Mr. S[] was generally able to meet the demands of tests assessing higher reasoning/problem solving abilities. Mild executive dysfunction persists affecting both cognitive and emotional domains.

Assessment of emotional/behavioral functioning revealed report
by Mr. S[] of continuing to experience cognitive difficulties as well
as sleep disturbance, increased emotional reactivity, and
lingering pain/somatic symptoms. Energy level was described as
being low/diminished. Formal evaluation revealed report by Mr.
S[], as well as his wife, of being compromised by apathetic
changes to his personality and executive dysfunction. Mr. S[]
continues to experience sleep disturbance/diminished energy that
along with pain and somatic symptoms contributes to his
experiencing of cognitive difficulties in his day to day pursuits.

All in all, Mr. Treli S[] has made a reasonably good recovery from
a mild traumatic brain injury and other injuries that were
sustained in a motor vehicle accident. There are lingering mild
attentional/executive impairments as well as functional
difficulties including pain and sleep disturbance/fatigue that
render Mr. S[] to experience cognitive difficulties in his day to
day pursuits. Certainly, there is need for continuing intervention
particularly with regard to sleep disturbance that might be of
assistance to Mr. S[]. Mr. S[] does not appear able to return to his
previous employment capacity. Indeed, Functional Capacity
Evaluation rendered the opinion that Mr. S[] was able to function
in a light physical demand category. Per Dr. Stickler's
recommendation, I do believe Mr. S[] could profit from
investment in neuropsychological intervention directed toward
attaining a full and educative awareness of his lingering
impairments that would be directed toward development of
effective compensatory strategies as well as attainment of
acceptance for the impairments that will persist. Potential
modification of Mr. S[]'s regimen of medications might also be
pursued, particularly with regard to improvement in
sleep/restorative rest. Mr. S[] is assessed as meeting diagnostic
criteria for mild neurocognitive disorder due to multiple etiologies
(DSM–5 331.83) including the residuals of a mild traumatic brain
injury; evidence for cerebrovascular small vessel disease; and the
interfering aspects of chronic pain/somatic symptoms, sleep
disturbance/fatigue, and need for use of an extensive regimen of
medications.

Tr. at 850–51. Dr. Waid assessed an 8% impairment to the whole person due

to residual neurocognitive/brain behavior impairments based on the

23

*American Medical Association Guides to the Evaluation of Permanent Impairment* (6th Ed.). Tr. at 851–52.

Plaintiff returned to Dr. Adkins for routine follow up for diabetes and hypertension on November 30, 2018. Tr. at 858. He complained of left knee pain and clicking, a dry, rough patch of skin on his lower left leg, and sleep disturbance. *Id.* Dr. Adkins observed Plaintiff to ambulate with a quad cane and demonstrate full ROM of the left knee with some crepitus. *Id.* He noted Plaintiff's diabetes was under good control and his blood pressure was doing well. Tr. at 859. He ordered x-rays of Plaintiff's left knee and prescribed Trazodone for sleep. *Id.*

On October 7, 2019, Plaintiff reported poor memory and chronic shoulder pain. Tr. at 1455. Dr. Adkins reviewed lab studies and refilled Plaintiff's medications for diabetes, hypertension, chronic pain, erectile dysfunction, and insomnia. Tr. at 1455–58.

Plaintiff complained of bilateral knee pain on May 18, 2020. Tr. at 1450. Dr. Adkins noted Plaintiff ambulated with a quad cane, but had no gross deformity in either knee, full ROM on flexion and extension of both knees, and some tenderness to palpation of the patellar tendon. *Id.* He refilled Diclofenac Sodium 75 mg and prescribed Tizanidine HCl 4 mg. *Id.*

On July 31, 2020, Plaintiff reported he had been denied social security benefits and requested that Dr. Adkins document all of his issues. Tr. at

1446. He complained of severe pain in his shoulders and knees, occasional right rib pain, memory issues, inability to sit or stand for long periods, inability to drive more than 15 minutes by himself, frequently seeing shadows in his peripheral vision, requiring frequent reminders, difficulty spelling, forgetting names, and balance problems requiring ambulation with a quad cane. *Id.* He weighed 351 pounds and had a BMI of 45.06 kg/m.[2] *Id.* Dr. Adkins noted Plaintiff had 2+ pitting edema in his lower extremities, ambulated with a quad cane, had somewhat flattened affect, relied on his phone to jog his memory, and appeared "[s]omewhat spaced out, at his baseline since accident." Tr. at 1447. He wrote:

> Continues to have impairment from his traumatic brain injury, unlikely to be able to hold down a job as a result. He requires frequent reminders to complete tasks. He is not safe to drive commercially. He has chronic pain that limits his ability to engage in strenuous work. May benefit from referral to neurologist for formal neuropsychiatric testing to quantify degree of disability.

*Id.* He refilled medications for diabetes, hypertension, insomnia, bilateral primary knee osteoarthritis, pain, and erectile dysfunction. Tr. at 1448.

Plaintiff presented to Pravin R. Patel, M.D. ("Dr. Patel"), for an orthopedic consultative exam on December 1, 2020. Tr. at 1463–68. He reported pain in his lower back, right shoulder, and right hand and problems with balance, memory, right-sided weakness, hypertension, sleep apnea, and his left eye. Tr. at 1464. Dr. Patel noted Plaintiff was 6'2" tall, weighed 335

pounds, and had a BMI of 43 kg/m.² Tr. at 1466. He recorded Plaintiff's vision as 20/70 in the right eye and 20/200 in the left eye without glasses, but 20/20 in both eyes with best correction. *Id.* He observed Plaintiff to "move around the room freely without bumping into surrounding objects." *Id.* He noted normal ROM in Plaintiff's cervical spine, bilateral elbows, bilateral wrists, left knee, left hip, and bilateral ankles. *Id.* He indicated reduced ROM to lumbar flexion, extension, and lateral rotation, right shoulder abduction, adduction, forward elevation, and internal and external rotation, right knee motion, and right hip abduction, adduction, flexion, and internal and external rotation. Tr. at 1466–67. He recorded 5/5 hand grip on the left and 4+/5 hand grip on the right. Tr. at 1467. He indicated Plaintiff changed position slowly, walked slowly with a wide-based gait, barely squatted, failed to perform tandem, heel, and toe walks, and ambulated with a four-point cane. *Id.* He wrote: "Mentally, claimant is clear, coherent; and he is able to handle his own funds if provided." *Id.* He also wrote: "Claimant complains of poor memory, but he is oriented to place, person, and time. He provides fairly good history and follows verbal command." *Id.*

On December 4, 2020, Plaintiff complained to Dr. Adkins of dizziness that had been ongoing since his 2017 MVA, but had increased from once a week to more often within the prior four to six weeks. Tr. at 1471. Dr. Adkins noted Plaintiff demonstrated 2+ pitting edema in his lower extremities,

26

ambulated with a quad cane, had somewhat flattened affect, and was "[s]omewhat spaced out, at his baseline since accident." *Id.* He assessed vestibular dysfunction in both ears and diabetes without complications. *Id.* He prescribed Meclizine HCl 12.5 mg for dizziness. *Id.* Plaintiff declined a physical therapy referral. *Id.*

On December 30, 2020, state agency psychological consultant Kendra Werden, Ph.D. ("Dr. Werden"), reviewed the evidence and completed a PRT in which she considered Listing 12.02, as well as Listing 12.04 for depressive, bipolar, and related disorders. Tr. at 1106–08. She assessed mild limitations to Plaintiff's abilities to understand, remember, or apply information and concentrate, persist, or maintain pace. Tr. at 1106. She found Plaintiff had no limitations in his abilities to interact with others or adapt or manage himself. *Id.*

On January 8, 2021, state agency medical consultant Isabella McCall, M.D. ("Dr. McCall"), assessed Plaintiff's physical RFC as follows: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of four hours; sit for a total of about six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; occasionally reach overhead with the right upper extremity; frequently handle and finger

with the right upper extremity; and avoid concentrated exposure to hazards. Tr. at 1110–14.

On January 29, 2021, Plaintiff reported his dizziness had improved and was only occurring once or twice a week. Tr. at 1478. He stated he felt a sensation of dizziness when he was startled or turned his head too quickly to the side and noticed increased dizziness when he forgot to take his medicine. *Id.* Dr. Adkins noted 2+ pitting edema in Plaintiff's lower extremities, ambulation with a quad cane, somewhat flattened affect, and "[s]omewhat spaced out" mental functioning. *Id.* He stopped Metformin, as Plaintiff had demonstrated tight glycemic control, and continued his other medications. Tr. at 1479–80.

On April 5, 2021, Plaintiff complained of bilateral leg swelling that was worse on the right. Tr. at 1475. He brought in pictures that showed 3+ leg swelling and indicated compression stockings had not been helpful and elevation had been helpful, although the swelling returned upon standing. *Id.* He described trouble perceiving the passage of time such that several hours sometimes felt like only a few minutes. *Id.* Dr. Adkins observed 2+ pitting edema to the bilateral lower extremities, ambulation with a quad cane, and somewhat flattened affect and stated Plaintiff appeared "[s]omewhat spaced out, at his baseline since accident." Tr. at 1476. He prescribed Aldactone for edema. *Id.*

28

On November 5, 2021, Plaintiff presented to Douglas Ritz, Ph.D. ("Dr. Ritz"), for a consultative psychological evaluation. Tr. at 1486–88. He endorsed problems with immediate and short-term memory. Tr. at 1486. Dr. Ritz observed Plaintiff's speech to be clear and relevant, but noted he "sometimes had long pauses before he answered." Tr. at 1487. He indicated Plaintiff sustained his effort and concentration on the WAIS-IV and the Wide Range Achievement Test, Fifth Edition ("WRAT-5") and had intact insight and judgment. *Id.* He stated Plaintiff's full-scale WAIS-IV score fell within low-average limits, his verbal comprehension was at the upper limits of the low-average range, his perceptual reasoning and working memory were within average limits, and his processing speed fell within the borderline range. Tr. at 1488. Plaintiff's scores on the WRAT–5 placed him in the fifth percentile and at a fifth grade, third month equivalency for word reading and in the thirty-fourth percentile and at an eighth-grade level for math computation. *Id.*

Dr. Ritz wrote the following:

There is very slight evidence for mild neurocognitive disorder. It may be that the deficits in the Processing Speed areas are reflective of that. However, this would not prevent the claimant from performing at least in some type of unskilled type work setting. He would be able to handle funds and avoid physical danger. He does minimal in the way of daily activities in terms of chores, mainly because of some of his physical health constraints rather than any mental health problems or because of traumatic brain injury. He takes care of his personal grooming consistently. He can interact socially.

*Id.* He diagnosed possible mild neurocognitive disorder due to TBI. *Id.*

On November 10, 2021, state agency psychological consultant Rebekah Jackson, Psy.D. ("Dr. Jackson"), reviewed the record and completed a PRT in which she considered Listings 12.02 and 12.04, and assessed the same degree of limitation as Dr. Werden. *Compare* Tr. at 1106–08, *with* Tr. at 1122–24.

On December 9, 2021, state agency medical consultant Christopher Gates, M.D. ("Dr. Gates"), reviewed the evidence and assessed the same physical RFC as Dr. McCall. *Compare* Tr. at 1110–14, *with* Tr. at 1125–27.

Plaintiff complained of severe bilateral foot pain on February 11, 2022. Tr. at 1494. Dr. Adkins ordered lab studies to assess Plaintiff's uric acid level, as he suspected some element of gout. Tr. at 1496. He refilled Plaintiff's medications. Tr. at 1496–97.

On May 12, 2022, Plaintiff reported his home blood sugars were doing well, despite his skyrocketed A1C. Tr. at 1491. He endorsed worsened neuropathy in his feet, left shoulder and hand pain, and freezing of his left index finger. *Id.* Dr. Adkins noted 2+ pitting edema of the bilateral lower extremities, ambulation with a quad cane, somewhat flattened affect, and baseline "[s]omewhat spaced out" mental functioning. Tr. at 1492. He prescribed Actos 15 mg and refilled Amitriptyline for insomnia, Diclofenac Sodium for osteoarthritis, Clonidine HCl, Procardia XL, and Valsartan for

hypertension, Meclizine for vestibular dysfunction, Cialis for erectile dysfunction, and Neurontin for chronic pain. Tr. at 1493.

### C.    The Administrative Proceedings

#### 1.    The Administrative Hearing

##### a.    Plaintiff's Testimony

###### i.    First Hearing

At the hearing on April 3, 2019, Plaintiff testified he was 6'2" tall, weighed 365 pounds, and was right-handed. Tr. at 38–39. He confirmed he had a driver's license, but said he had not driven since the MVA on January 25, 2017, because he was unable to sustain concentration. Tr. at 39. He indicated he had been employed as a logging truck driver with T & D Logging for two to three weeks prior to the MVA. Tr. at 39–40. He stated he was unable to recall the MVA, but had been told it was a head-on collision. Tr. at 40. He confirmed he had filed and settled a workers' compensation claim concerning his injuries. Tr. at 42.

Plaintiff testified he had previously been self-employed as a contract truck driver through Schneider from 2004 through 2016. *Id.* He described duties that included selecting loads, breaking down the pay rate per load, transporting freight, loading and offloading trailers, inspecting equipment, and connecting and disconnecting trailers. Tr. at 41–42. He estimated he lifted over 100 pounds. Tr. at 42.

Plaintiff indicated he had sustained a brain injury in the MVA. *Id.* He testified he had difficulty comprehending and perceiving what was happening around him, reacted slowly, and forgot things within a short period of time. *Id.* He said he had been discharged from the hospital with a quad cane that he required for standing and ambulation. Tr. at 42–43. He estimated he could stand for 15 minutes with his cane and five minutes without his cane, although he would have to prop himself up on something. Tr. at 43. He said he could walk with his cane for six to 10 minutes without stopping. Tr. at 49. He endorsed difficulty standing from a seated position. *Id.* He indicated he required support to keep himself from falling backwards while sitting. *Id.* He estimated he could sit for 45 minutes to an hour. *Id.*

Plaintiff stated he had also sustained fractures to his right clavicle, right shoulder, rib, and skull. Tr. at 43. He endorsed difficulties reaching overhead with his right shoulder, lifting seven pounds or more with his right upper extremity, and moving his right upper extremity behind him. Tr. at 46–47. He said he could hold his right arm out in front of him, but could not do so for more than two to three minutes. Tr. at 48. He confirmed he had participated in physical therapy and continued to perform at-home therapy exercises to address his pain. Tr. at 48. He stated he had received right shoulder joint injections that had provided no relief and increased his pain. *Id.* He said he had discussed shoulder replacement with his doctor, but did

not qualify for the procedure because he was overweight by more than 70 pounds and was under 60 years old. Tr. at 48–49.

Plaintiff testified he continued to take Diclofenac, Gabapentin, and Hydrocodone for pain. Tr. at 47. He denied side effects from those medications. *Id.*

Plaintiff stated he had paid the bills prior the MVA, but no longer did so because he had difficulty remembering to pay them. Tr. at 50. He explained that his therapy had included use of a calendar to record tasks, but he had difficulty remembering to write on the calendar the tasks he was supposed to remember. *Id.*

Plaintiff testified he lived with his wife and three daughters, ages 19, 14, and 4. Tr. at 54. He stated his wife assisted him in getting into the shower and drying his body and his wife and daughters help him put on his pants, socks, and shoes. Tr. at 51. He described daily activities that included trying to watch television, playing the Xbox for a little while, performing home physical therapy exercises, and walking around a little. *Id.* He stated difficulty concentrating prevented him from watching a two-hour movie. Tr. at 52. He said he could play Xbox for 10 to 15 minutes at a time. *Id.* He indicated his wife and children performed the household chores. *Id.* He stated he could not cook because he tended to start cooking, walk away, and forget the food he was cooking. *Id.* He said his wife worked outside the home and his

oldest daughter typically stayed with him during the day. Tr. at 52–53. He indicated that when his oldest daughter worked during the day, his brothers usually stayed with him. *Id.* He stated he had difficulty falling asleep and sleeping through the night. Tr. at 53–54. He said he often napped until 10:00 AM. Tr. at 54.

Plaintiff testified he sometimes accompanied his wife on trips to the grocery store to get out of the house. *Id.* He denied participating in the shopping and doing the laundry. Tr. at 54–55.

### ii.    Second Hearing

At the hearing on June 1, 2022, Plaintiff testified he lived with his wife and his four children, who ranged in age from seven months old to 22 years old. Tr. at 983–84. He indicated his wife and children had no mental or physical health limitations. Tr. at 984. He confirmed he had a driver's license and drove. Tr. at 986.

Plaintiff testified he cared for his seven-month-old daughter for "maybe two hours" while his wife was at work. Tr. at 985. He explained his wife left for work around 7:00 AM, the baby slept until noon, his eight year old helped to care for the baby when she returned from school around 2:00, and his 18-year-old daughter also helped. *Id.*

Plaintiff denied using alcohol, tobacco, and illegal drugs. Tr. at 987–88. He indicated his children were not involved in school-based or community

activities. Tr. at 988. He stated he did not engage in any volunteer work. *Id.* He said he had not collected unemployment or any other government or private benefits, had not worked anywhere, and had not applied for any work since January 2017. Tr. at 987–88. He testified he had a commercial driver's license and had visited the Department of Motor Vehicles since January 2017 for an address change, but they had required nothing other than an eye exam. Tr. at 988–89.

Plaintiff testified his wife would usually call him from work to remind him to take his medications and inform him of the tasks he needed to perform. Tr. at 992. He denied doing laundry, cooking, and cleaning. *Id.* He said he would cut half of the lawn with a riding mower once a month. Tr. at 993. He indicated he watched television, played games, and read a little during the day. *Id.* He said he watched the news, checked email, and read cookbooks, although he did not cook because of his forgetfulness. Tr. at 994.

Plaintiff testified he was unable to work due to memory problems, limited ability to use his right shoulder, confusion, and difficulty comprehending simple tasks. Tr. at 996. He said he considered his shoulder problems to be the same as they were at the time of the first hearing. Tr. at 997. He stated he was not certain of the source of his balance problems, but thought they were likely a result of his brain injury. Tr. at 997–98. He explained his legs gave way while he was standing, and he tended to fall to

the left or right upon turning corners while walking. Tr. at 998. He said he could not lean forward to pick up objects because he tended to lean too far forward. *Id.* He denied having fallen to the ground because he could usually grab onto a wall or counter. *Id.* He indicated his balance problems had been ongoing since 2017 and he had been using a quad cane since that time. Tr. at 998–99. He stated he required his cane or something to hold onto as he moved about his house and always used his cane outside his house. Tr. at 999. He said he experienced instability five days per week and lost his balance while walking once or twice a week. Tr. at 1000–01. He indicated he lost his balance a couple times a week after standing for 20 to 30 minutes. Tr. at 1001. He confirmed that his problems had remained the same since 2017. Tr. at 1002.

Plaintiff testified he continued to have problems with his right shoulder, for which he took medication. *Id.* He said he could not extend all the way to reach overhead. *Id.* He rated his shoulder pain as an eight, on average. Tr at 1003. He estimated he could lift a maximum of seven to 10 pounds with his right arm. *Id.* He said his baby weighed 20 pounds, but he used both his arms to change her diapers. *Id.* He stated his shoulder function was not limited due to pain; it would not function to move. Tr. at 1004. He indicated his right arm would not raise all the way up "mechanically" and only extended about 75% of the way up. *Id.*

Plaintiff stated he could drive short distances, but had difficulty driving five miles to the next town over. Tr. at 1005. He clarified that he needed to be holding on to his cane or a counter to stand for 20 to 30 minutes. *Id.* He said he experienced increased pain in his legs upon walking for five to 10 minutes. Tr. at 1007. He indicated he could sit for about 30 minutes before he would need to move around due to pain in his right calf. Tr. at 1008, 1009. He said he had started taking a fluid pill during the prior year because of swelling in his calves. Tr. at 1009. He said he raised his leg for 30 to 40 minutes at a time to reduce the swelling and did so for a total of about three hours during the day. Tr. at 1009–10.

Plaintiff testified that, in addition to reminding him to take his medications, his wife sometimes had to remind him to go to sleep and use the bathroom. Tr. at 1010. He said he required assistance to put on his shoes and tie them about five days per week. Tr. at 1011. He denied watching an entire television show in one sitting and said he played only one game on the Xbox. Tr. at 1012. He confirmed he had difficulty remembering appointments and said he used his phone for reminders. Tr. at 1012–13.

### b.    Vocational Expert Testimony

Vocational Expert ("VE") Norma Stricklin reviewed the record and testified at the hearing on June 1, 2022. Tr. at 1013–32. She testified she had worked in vocational rehabilitation and job placement for over 30 years and

had been testifying as a vocational witness for the Social Security Administration ("SSA") since 1995. Tr. at 1014. She identified Plaintiff's PRW as a truck driver, *Dictionary of Occupational Titles* ("*DOT*") No. 905.663-014, requiring medium exertion and a specific vocational preparation ("SVP") of 4. Tr. at 1015.

The ALJ indicated it was his understanding that the *DOT* did not differentiate between dominant and non-dominant upper extremities or between directional and overhead reaching. *Id.* He asked the VE if her testimony as to those matters would be based on her training, education, and work experience. *Id.* The VE confirmed it would. *Id.*

The ALJ described an individual of Plaintiff's vocational profile who would be limited to work at the light exertional level with the following additional limitations: no greater than frequent operation of hand controls on the right with no limitation on the left; occasional right overhead reaching with no limitation on the left; frequent directional reaching, handling, fingering, and feeling on the right with no limitation on the left; occasional climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; occasional balancing, stooping, kneeling, and crouching; no crawling; no work at unprotected heights; no work around moving mechanical parts or dangerous machinery; no operation of a motor vehicle; avoid concentrated exposure to tools and work processes that would expose the right upper

extremity and lower extremities to vibration; limited to simple and routine tasks and simple work-related decisions; and time off-task to be accommodated by ordinary breaks. Tr. at 1015–16. He asked if the individual would be able to perform Plaintiff's PRW. Tr. at 1016. The VE stated the individual would be unable to do so. *Id.* The ALJ asked the VE if there would be alternative work available. *Id.* The VE identified jobs at the light exertional level with an SVP of 2 as a ticket taker, *DOT* No. 344.667-010, a counter clerk, *DOT* No. 249.366-010, and an information clerk, *DOT* No. 237.367-018, with 2,000, 20,000, and 60,000 positions in the national economy, respectively. Tr. at 1016–17.

The ALJ asked the VE to consider the limitations provided in the first hypothetical question, but to assume the individual would never be able to perform overhead reaching with the right upper extremity. Tr. at 1017. He asked if the additional restriction would have any impact on the availability of the jobs the VE previously identified. *Id.* The VE testified it would not. *Id.*

The ALJ asked the VE to consider the limitations provided in the prior question, but to assume the individual would be limited to occasional operation of hand controls with the right upper extremity. Tr. at 1017–18. The VE testified the additional restriction would eliminate the other two positions, but the counter clerk position would remain in the same numbers. Tr. at 1018. She identified additional jobs the individual would be able to

perform as a rental clerk, *DOT* No. 295.467-014, and an usher, *DOT* No. 344.677-014, with 10,000 and 5,000 positions in the national economy, respectively. Tr. at 1018.

The ALJ asked the VE to consider that the individual would require a sit/stand option, defined as a brief postural change at or near the workstation, no more frequently than twice each hour, for a duration of no greater than five minutes each time. Tr. at 1019. He asked if the same positions would remain. *Id.* The VE testified the individual would be able to perform the jobs previously identified, but the number of positions would be reduced by half. *Id.* The VE confirmed the *DOT* did not address a sit/stand option and indicated her testimony as to that matter was based on her training, education, and work experience. Tr. at 1019–20.

The ALJ asked the VE to consider that the individual described in the first question would require a handheld assistive device, such as a cane, to engage in prolonged ambulation, ascend and descend slopes, traverse over uneven terrain, and climb. Tr. at 1020. He asked if the additional restriction would impact the jobs the VE previously identified. *Id.* The VE testified the positions would be precluded. *Id.* The ALJ asked the VE to further assume the individual would require a cane for all ambulation and any time he was on his feet. *Id.* He asked if such a restriction would eliminate all jobs at the light exertional level. *Id.* The VE testified it would. Tr. at 1021.

The ALJ asked the VE if it would eliminate the light positions she had previously identified if the individual could stand and walk for no greater than three hours in an eight-hour workday. *Id.* The VE testified it would eliminate those jobs and would effectively eliminate all work at the light exertional level. *Id.*

The ALJ asked the VE if the individual's use of an assistive device would eliminate all work at the light exertional level. *Id.* The VE testified it would. *Id.*

The ALJ asked the VE to consider only the limitations presented in the first hypothetical question, except that the individual would be limited to sedentary work. *Id.* He asked the VE to identify jobs an individual would be able to perform, given the specified restrictions. *Id.* The VE identified sedentary jobs with an SVP of 2 as a scaler, *DOT* No. 559.687-014, a telephone order clerk, *DOT* No. 209.567-014, and an information clerk, *DOT* No. 237.367-046, with 15,000, 12,000, and 10,000 positions in the national economy, respectively. Tr. at 1021–22.

The ALJ asked the VE if she had considered her knowledge of the *DOT* and its companion publications, her training, her education, her work experience, knowledge of the jobs, and the age, education, and work experience of the claimant in identifying jobs in response to the hypothetical questions. Tr. at 1022–23. The VE confirmed she had and that any variance

from the publications was based on her training, education, and work experience. Tr. at 1023.

The ALJ asked the VE if there would be any impact on the sedentary jobs she identified if the individual were not able to reach overhead with the right upper extremity. *Id.* The VE stated there would be no impact. *Id.*

The ALJ asked the VE to further assume the individual would be limited to occasional handling, fingering, and feeling with the right dominant hand. Tr. at 1024. He asked if this would eliminate the jobs the VE previously identified. *Id.* The VE testified it would. *Id.* The ALJ asked if there would be other jobs available. *Id.* The VE stated there would be no jobs existing in significant numbers that the individual would be able to perform. *Id.*

The ALJ asked the VE to return to the original sedentary hypothetical question and to consider that the individual would need a sit/stand option, defined as a brief postural change at or near the workstation, no more frequent than twice per hour, and of a duration of no greater than five minutes each time. Tr. at 1024–25. He asked if the same jobs would remain in the same numbers. Tr. at 1025. The VE confirmed they would. *Id.*

The ALJ asked the VE to return to the original sedentary hypothetical question and to assume the individual would require the use of a handheld assistive device for prolonged ambulation, ascending and descending slopes,

42

and traversing uneven terrain. *Id.* He asked if the individual would still be able to perform the same jobs in the same numbers. *Id.* The VE stated he would. *Id.*

The ALJ asked the VE to further assume the individual would require the handheld assistive device for balancing and all ambulation. *Id.* He asked if the additional restriction would have any impact on the availability of the jobs the VE previously identified. *Id.* She testified it would not. *Id.*

The ALJ asked the VE to consider that the individual would have a cumulative and consistent ability to stand and/or walk for no greater than one hour in an eight-hour day. Tr. at 1026. He asked if the same jobs would remain in the same numbers. *Id.* The VE stated they would. *Id.* The ALJ acknowledged that the VE's testimony varied from the *DOT* as to this matter and confirmed that it was based on her training, education, and work experience. *Id.*

The ALJ asked the VE what percentage of time off-task would result in elimination of the previously-identified jobs and all other jobs in the national economy. *Id.* The VE testified that being off-task more than 3% of the day, in addition to normal breaks, would eliminate all work. *Id.*

The ALJ asked the VE at what point absenteeism would eliminate all work. Tr. at 1027. The VE testified that more than one absence per month on a cumulative and consistent basis would eliminate all jobs. *Id.* The ALJ

confirmed with the VE that the *DOT* did not address time off-task and absenteeism and that her testimony as to those matters was based on her training, education, and work experience. Tr. at 1027–28. He further confirmed that the *DOT* did not distinguish between climbing of ramps, stairs, ladders, ropes, and scaffolds or differentiate between standing and walking and that the VE had based her testimony regarding such matters on her training, education, and experience. Tr. at 1028.

The ALJ asked the VE to consider the individual limited to sedentary work and to further assume the individual would be capable of standing and walking for less than one hour in an eight-hour workday. Tr. at 1028–29. He asked if the additional restriction would eliminate the sedentary positions. Tr. at 1029. The VE testified it would not. *Id.*

The ALJ asked the VE to consider that the individual would have a marked or substantial loss in the ability to perform one of the basic mental demands of unskilled work. *Id.* He questioned whether that would eliminate all work. *Id.* The VE stated it would. *Id.*

The ALJ asked the VE to consider that the individual would be incapable of maintaining work on a consistent basis at any exertional level for eight hours a day and 40 hours a week. *Id.* He questioned whether this would eliminate all jobs. *Id.* The VE confirmed it would. Tr. at 1030. The VE

affirmed that her most recent responses considered the *DOT* and its companion publications, as well as her work experience. *Id.*

Plaintiff's counsel questioned the VE as to the definition of sedentary work and asked her if it would eliminate sedentary work if an individual could not stand and walk cumulatively for up to two hours per day. Tr. at 1031. The VE testified it would not eliminate sedentary work because she had identified jobs in response to the hypothetical question that she would identify for an individual in a wheelchair. *Id.* Plaintiff's counsel asked if a wheelchair would be considered an accommodation. *Id.* The VE stated a wheelchair would not specifically be required as an accommodation if a job was sedentary and could be performed on a sedentary basis. *Id.*

Plaintiff's counsel asked the VE to consider that the individual would need supervision to be redirected in order to complete tasks. *Id.* She asked if that would affect the jobs the VE identified. Tr. at 1031–32. The VE testified the individual may receive correction or redirection during the 30-day period in which he was expected to be learning the job, but should be able to function without further direction after 30 days. Tr. at 1032. Plaintiff's counsel questioned the VE as to what would happen if the individual were unable to perform without supervision and redirection to complete tasks after 30 days. *Id.* The VE stated all light and sedentary work would be precluded. *Id.*

2.     The ALJ's Findings

In his July 1, 2022 decision, the ALJ made the following findings of fact

and conclusions of law:

1.     The claimant meets the insured status requirements of the Social Security Act through March 31, 2022.

2.     The claimant has not engaged in substantial gainful activity since January 25, 2017, the date the claimant became disabled (20 CFR 404.1520(b), 404.1571 *et seq.*).

3.     From January 25, 2017, through June 21, 2018, the period during which the claimant was under a disability, the claimant had the following severe impairments: residual effects of traumatic brain injury; obesity; neurocognitive disorder; depression; degenerative joint disease of the right shoulder; and bilateral knee osteoarthritis (20 CFR 404.1520(c)).

4.     From January 25, 2017, through June 21, 2018, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.     After careful consideration of the entire record, the undersigned finds that, from January 25, 2017, through June 21, 2018, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except lifting and carrying 10 pounds occasionally and lesser amounts frequently; sitting for 6 hours in an 8-hour workday; standing and/or walking for 2 hours in an 8-hour workday; pushing and pulling as much as he can lift and carry; operating hand controls with the right hand frequently; occasionally reaching overhead to the right; frequently reaching all other directions on the right; handling, fingering, and feeling limited to frequent on the right; climbing ramps and stairs occasionally; never climbing ladders, ropes, or scaffolds; occasionally stooping, kneeling, balancing, and crouching; never crawling; never working at unprotected heights; never working around moving mechanical parts or dangerous machinery; never operating a motor vehicle as an occupational requirement; avoiding concentrated exposure to tools and work processes that would expose the claimant's right upper extremity and lower extremities on a concentrated basis to vibration; would require a sit/stand option defined as a brief postural change at or

near the work station no more than frequent than up to twice in an hour and a duration of up to 5 minutes each; would need a hand held assistive device in the nature of a cane for all ambulation, for ascending or descending slopes or traversing over uneven terrain, as well as for the purpose of maintaining balance; is able to perform simple, routine tasks; and can use judgment to perform simple work-related decisions. However, most significantly, secondary to the combination of marked loss in concentration, persistence and pace and a moderate loss in adaption secondary to the combination of impairments mental (primarily) and physical including the lack of predictability as to severity, duration and frequency of symptoms from the impairments during the relevant period, the claimant would have had a substantial loss in the ability to adapt to change and respond appropriately to change in the workplace and to usual work situations. For the same reason, as well as treatment demands during the relevant period, the claimant would have had off task needs in excess of 10% of the workday beyond ordinary breaks and would have had a cumulative and consistent absenteeism rate more than 1 day a month.

6. From January 25, 2017, through June 21, 2018, the claimant was unable to perform past relevant work (20 CFR 404.1565).

7. The claimant was a younger individual age 18–44, on the established disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. The claimant's acquired job skills do not transfer to other occupations within the residual functional capacity defined above (20 CFR 404.1568).

10. From January 25, 2017, through June 21, 2018, considering the claimant's age, education, work experience, and residual functional capacity, there were no jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1560(c) and 404.1566).

11. The claimant was under a disability, as defined by the Social Security Act, from January 25, 2017, through June 21, 2018 (20 CFR 404.1520(g)).

12. The claimant has not developed any new impairment or impairments since June 22, 2018, the date the claimant's disability ended. Thus, the claimant's current severe impairments are the same as that present from January 25, 2017, through June 21, 2018.

13. Beginning June 22, 2018, the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1594(f)(2)).

14. Medical improvement occurred as of June 22, 2018, the date the claimant's disability ended (20 CFR 404.1594(b)(1)).

15. The medical improvement that has occurred is related to the ability to work because there has been an increase in the claimant's residual functional capacity (20 CFR 404.1594(b)(4)(i)).

16. After careful consideration of the entire record, the undersigned finds that, beginning June 22, 2018, the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except lifting and carrying 10 pounds occasionally and lesser amounts frequently; sitting for 6 hours in an 8-hour workday; standing and/or walking for 2 hours in an 8-hour workday; pushing and pulling as much as he can lift and carry; operating hand controls with the right hand frequently; occasionally reaching overhead to the right; frequently reaching all other directions on the right; handling, fingering, and feeling frequently on the right; climbing ramps and stairs occasionally; never climbing ladders, ropes, or scaffolds; occasionally stooping, kneeling, balancing, and crouching; never crawling; never working at unprotected heights; never working around moving mechanical parts or dangerous machinery; never operating a motor vehicle as an occupational requirement; avoiding concentrated exposure to tools and work processes that would expose the claimant's right upper extremity and lower extremities on a concentrated basis to vibration; would require a sit/stand option defined as a brief postural change at or near the work station no more frequent than up to twice in an hour and a duration of up to 5 minutes each; would need a hand held assistive device in the nature of a cane for all ambulation, for ascending or descending slopes or traversing over uneven terrain, as well as for the purpose of maintaining balance; is able to perform simple, routine tasks; can use judgement to perform simple, work-related decisions; and can deal with changes in the work setting to make simple work-related decisions. Any time off task can be accommodated by ordinary breaks.

17. The claimant is unable to perform past relevant work (20 CFR 404.1565).

18. The claimant's age category has not changed since June 22, 2018 (20 CFR 404.1563).

19. The claimant's education level has not changed (20 CFR 404.1564).
20. Beginning June 22, 2018, considering the claimant's age, education, work experience, and residual functional capacity, there have been jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c) and 404.1566).
21. The claimant's disability ended June 22, 2018, and the claimant has not become disabled again since that date (20 CFR 404.1594(f)(8)).

Tr. at 938–58.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ failed to properly support his conclusion that medical improvement occurred beginning June 22, 2018;

2)    the ALJ did not consider his use of a cane in accordance with the applicable regulations and SSRs;

3)    the ALJ did not address his obesity in accordance with SSR 19-2p; and

4)    the ALJ presented the VE with an incomplete hypothetical question that failed to include all of his mental limitations.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly

49

apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[5] (4)

---

[5] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

whether such impairment prevents claimant from performing PRW;[6] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating

---

[6] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold

the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    Medical Improvement

Plaintiff argues the ALJ erred in finding medical improvement had occurred that resulted in him no longer being disabled as of June 22, 2018. [ECF No. 10 at 40]. He claims this conclusion is contrary to Drs. Waid's and Ritz's findings, which were consistent with Dr. Sausser's findings in December 2017. *Id.* at 41–43. He maintains Dr. Adkins's observations further suggest no improvement in his mental functioning had occurred. *Id.* at 44.

The Commissioner argues the ALJ adequately explained his finding of medical improvement. [ECF No. 14 at 9–10]. He points to PT Volpe's June

2018 FCE as supporting medical improvement. *Id.* at 10. He notes Dr. Waid specified Plaintiff's "performance was improved compared to previous evaluation." *Id.* (citing Tr. at 851).

Medical improvement is generally considered in the context of periodic disability reviews for individuals who were previously awarded benefits. 42 U.S.C. § 423(f); 20 C.F.R. § 404.1594(a). Although the Fourth Circuit does not appear to have addressed the issue, the majority of circuits have "conclude[d] that the medical improvement standard, as created in 42 U.S.C. § 423(f) and defined by 20 C.F.R. § 404.1594(b), applies in 'closed period' cases in which a disability claimant is found to have been disabled for a finite period of time." *Shepherd v. Apfel*, 184 F.3d 1996, 1198, 1200–01 (10th Cir. 1999) (citing *Pickett v. Bowen*, 833 F.3d 288, 292, 293 n.4 (11th Cir. 1987); *Jones v. Shalala*, 10 F.3d 522, 523–24 (7th Cir. 1993); *Chrupcala v. Heckler*, 829 F.3d 1269, 1274 (3d Cir. 1987)); *see also Attmore v. Colvin*, 827 F.3d 872, 874 (9th Cir. 2016) ("We conclude that in closed period cases an ALJ should compare the medical evidence used to determine that the claimant was disabled with the medical evidence existing at the time of asserted medical improvement.").

Pursuant to 20 C.F.R. § 404.1594(b)(1):

Medical improvement is any decrease in the medical severity of your impairment(s) which was present at the time of the most recent medical decision that you were disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on improvement in the

symptoms, signs, and/or laboratory findings associated with your impairment(s).

The ALJ found that "from January 25, 2017, through June 21, 2018, the claimant had . . . marked limitation in concentrating, persisting, or maintaining pace and moderate limitation in adapting or managing oneself." Tr. at 940. He found that beginning June 22, 2018, Plaintiff had moderate limitation in concentrating, persisting, or maintaining pace and mild limitation in adapting or managing oneself. Tr. at 950–51.

The ALJ specifically concluded Plaintiff experienced medical improvement as of June 22, 2018. Tr. at 951. He wrote:

> On June 22, 2018, the claimant underwent a physical functional capacity evaluation, after his treatment providers determined that he had achieved maximum medical improvement from the injuries sustained in January 2017. The claimant's specialized treatment providers released him to follow as needed. Since June 2018, the claimant has generally followed with his primary care provider for treatment of the residual symptoms of his injuries and his other chronic conditions. Mentally, examinations prior to June 2018 documented objective findings of attentional difficulty and long-term memory problems. Subsequent neuropsychological evaluations demonstrate that while the claimant continued to experience lingering difficulties with attention, concentration and processing speed, his performance had improved compared to the previous evaluation. In sum, although the claimant sustained severe injuries in January 2017 that significantly limited his work-related mental and physical functioning, his condition had improved and stabilized by June 2018.

> For the period beginning June 22, 2018, the undersigned does not mean to imply that the claimant is perfectly healthy and without symptoms and some limitations; but rather, he is not totally debilitated or disabled within the context of the Social Security Act.

Tr. at 952. He further found that Plaintiff's "functional capacity for basic work activities" had increased beginning June 22, 2018. *Id.*

The ALJ included the same physical restrictions and some of the same mental restrictions in the RFC assessments for the periods prior to and beginning June 22, 2018. *Compare* Tr. at 941, *with* Tr. at 952–53. For the period from January 25, 2017, through June 21, 2018, the ALJ found:

> [S]econdary to the combination of a marked loss in concentration, persistence and pace and moderate loss in adaption secondary to the combination of impairments mental (primarily) and physical including the lack of predictability as to severity, duration and frequency of symptoms from the impairments during the relevant period, the claimant would have had a substantial loss in the ability to adapt to change and respond appropriately to change in the workplace and to usual work situations. For the same reasons, as well as treatment demands during the relevant period, the claimant would have had off task needs in excess of 10% of the workday beyond ordinary breaks and would have had a cumulative and consistent absenteeism rate more than 1 day a month.

Tr. at 941. However, for the period beginning June 22, 2018, the ALJ found Plaintiff could "deal with changes in the work setting to make simple work-related decisions" and "any time off task c[ould] be accommodated by ordinary breaks." Tr. at 953.

After a thorough review of the record, the court concludes substantial evidence supports the ALJ's finding of medical improvement. The ALJ thoroughly discussed the evidence that supported his assessment of lesser degrees of limitation in concentrating, persisting, or maintaining pace and

adapting or managing himself beginning June 21, 2018. *Compare* Tr. at 940, *with* Tr. at 950–51. With respect to the period from January 25, 2017, through June 21, 2018, the ALJ explained his assessment of marked limitation in concentrating, persisting, or maintaining pace as follows: "During an August 2017 neuropsychological evaluation, [Plaintiff] demonstrated difficulties effectively sustaining attention concentration with slow mental psychomotor processing speed. His performance on a continuous visual processing test revealed attentional problems. (Exhibit 9F). Accordingly, the claimant had marked limitations in this area." Tr. at 940. He based his assessment of moderate limitation in adapting or managing oneself on Plaintiff's requirement of home assistance with ADLs from February 24 through March 31, 2017, his use of a calendar to compensate for memory problems, and his August 2017 development of a depressive disorder related to his TBI and residual effects of multiple physical injuries. Tr. at 941

    For the period beginning June 22, 2018, the ALJ explained the assessment of a moderate limitation in concentrating, persisting, or maintaining pace as follows:

> In a July 2018 function report, the claimant reported problems completing tasks, concentrati[ng], and following instructions (Exhibit 5E/5). In an October 2018 neuropsychological report, the claimant demonstrated mild attentional executive limitations, as well as functional difficulties including pain, sleep disturbance, and fatigue that caused cognitive difficulties in his day-to-day pursuits (Exhibit 29F/8). The evaluation revealed lingering difficulties with attention concentration and processing speed,

> though his performance was improved compared to previous
> evaluation in August 2017 (Exhibit 29F). He was generally able
> to meet the demands of tests assessing higher reasoning problem
> solving abilities, although mild executive dysfunction persisted,
> affecting both cognitive and emotional domains (Exhibit 29F).

Tr. at 951. He indicated the assessment of mild limitation in adapting or

managing oneself was based on the following:

> In a July 2018 function report, the claimant reported being able
> to handle stress very well but being more emotional now and
> being challenged when handling changes in routine (Exhibit
> 5E/7). He did not have any unusual behavior or fears (Exhibit
> 5E/7). The claimant is generally able to perform activities of
> personal care independently. He cares for his young daughter to
> the extent that he is physically able.

*Id.*

The undersigned is not persuaded by Plaintiff's argument that Dr.

Waid found him to be functioning in the same manner in September and

October 2018 as he had been in August 2017. *See* ECF No. 10 at 41–42.

Medical improvement is *any* decrease in the medical severity of your

impairment(s) . . . ." 20 C.F.R. 404.1594(b)(1) (emphasis added). The ALJ's

explanation suggests he appreciated a decrease in the medical severity of

Plaintiff's impairments between Dr. Waid's August 2017 and October 2018

neuropsychological evaluation reports. In explaining the RFC assessment, he

discussed Dr. Waid's September and October 2018 evaluations, noting the

"[n]europsychological evaluation revealed lingering difficulties with

attention, concentration, and processing speed, though his performance was improved compared to previous evaluation." Tr. at 953–54. He wrote:

> Dr. Waid's opinion is persuasive in finding that the claimant's attention, concentration, and processing speed had improved significantly such that he would be able to sustain work activities with no more than ordinary breaks. This opinion is based on a detailed and comprehensive evaluation of the claimant, including standardized measures of cognitive functioning. It is also based on Dr. Waid's expertise as a neuropsychologist, and it is consistent with the largely unremarkable mental status examinations in the record since 2018.

Tr. at 954.

Although Dr. Waid's September and October 2018 testing produced some evidence consistent with his findings in August 2017, it also produced some evidence of improvement. *Compare* Tr. at 626–33, *with* Tr. at 844–52. Consistent with the ALJ's finding, Dr. Waid specifically wrote: "Neuropsychological evaluation revealed Mr. S[] to experience lingering difficulties with attention/concentration and processing speed though his performance was improved compared to previous evaluation." Tr. at 851. He further noted: "All in all, Mr. Treli S[] has made a reasonably good recovery from a mild traumatic brain injury." *Id.*

Plaintiff appears to argue the ALJ erred in finding Dr. Waid's September and October 2018 reports showed improvement because Dr. Waid's diagnoses were the same as Dr. Sausser's diagnoses in December 2017. [ECF No. 10 at 42]. The ALJ's finding of medical improvement is not

undermined simply because Drs. Waid and Sausser assessed the same diagnoses. The ALJ stated he found Dr. Sausser's opinion "unpersuasive regarding the period beginning June 2018." *Id.* Although he found Dr. Sausser's indications that Plaintiff had some problems in concentration as it related memory to be supported by the clinical findings, he considered his opinion vague insomuch as it failed to quantify the extent of Plaintiff's assessed concentration problems. *Id.* He further noted the opinion was rendered prior to Plaintiff's mental symptoms having improved to his new baseline. *Id.*

Although Plaintiff appears to argue Dr. Ritz's findings supported continued disability, the undersigned finds the ALJ thoroughly rejected this argument. The ALJ discussed Dr. Ritz's consultative exam, acknowledging Plaintiff's complaints of problems with immediate and short-term memory, as well as Dr. Ritz's observations that he sustained effort and concentration during standardized testing, had intact insight and judgment, showed no social or adaptive functioning deficits, and demonstrated a low-average full-scale intelligence quotient ("IQ") on the WAIS-IV, a low-average reading score and average math score on the WRAT-5, and a borderline processing speed index standard score. Tr. at 955. He considered persuasive Dr. Ritz's opinion that Plaintiff's mental deficits would not prevent him from performing in an unskilled work setting. *Id.*

The undersigned further rejects Plaintiff's argument that the ALJ failed to adequately consider Dr. Adkins's records. Tr. at 954. The ALJ acknowledged Plaintiff's reports to Dr. Adkins of poor memory in October 2019 and memory issues and forgetfulness in July 2020 and Dr. Adkins's documentation in January and April 2021 that he had "flattened affect" and was "somewhat 'spaced out' but was mentally at baseline." *Id.* He noted Dr. Adkins's treatment was routine and conservative. Tr. at 954. He indicated he was not persuaded by Dr. Adkins's July 2020 statement that Plaintiff's continued impairment from his TBI "render[ed] him unlikely to be able to hold down a job," "required frequent reminders to complete tasks, was not safe to drive commercially, and had chronic pain that limited his ability to engage in strenuous work." Tr. at 955–56. He explained Dr. Adkins's statement that Plaintiff was unable to work was one "clearly reserved to the Commissioner pursuant to 20 CFR 404.1527" and that the remainder of his opinion "lack[ed] specificity, [was] speculative . . . [was] ambiguous" and "lack[ed] citations to medical evidence of record or other supportive documentation." Tr. at 956.

The ALJ provided further justification for his findings of medical improvement. In explaining the RFC assessment for the period beginning June 22, 2018, he stated he had found Plaintiff's statements about the intensity, persistence, and limiting effect of his symptoms "inconsistent with

the evidence of record beginning in June 2018, which documents stable mental and physical symptoms, with significant improvement over his immediate post-injury functioning." Tr. at 953. He referenced the June 2018 FCE and considered its objective findings "persuasive" in determining Plaintiff's RFC "beginning in June 2018." *Id.* He noted Plaintiff's report to Dr. Patel of poor memory since the MVA, as well as Dr. Patel's indications that, "[a]lthough the claimant complained of poor memory, he was oriented to place, person, and time" and "provided a fairly good history and followed verbal commands during the exam." Tr. at 955. He concluded Dr. Patel's clinical findings supported the RFC assessment for the period beginning June 22, 2018. *Id.*

In light of the foregoing, the court finds substantial evidence supports the ALJ's finding of medical improvement beginning June 22, 2018.

### 2.    Use of a Cane

Plaintiff argues the ALJ and the VE ignored direction in the regulations that "the requirement to use a hand-held assistive device may . . . impact an individual's functional capacity by virtue of the fact that one or both upper extremities are not available for such activities as lifting, carrying, pushing, and pulling." ECF No. 10 at 45 (citing 20 C.F.R. Part 404,

Subpt. P, App'x 1, § 1.00(J)(4)[7]). He claims they further ignored the indication in SSR 96-9p that an individual's ability to perform sedentary work may be impacted by the use of a cane, that an individual who cannot stand and walk for two hours in an eight-hour day cannot perform the full range of sedentary work, and that the sedentary occupational base may be significantly eroded if an individual must use a cane for balance because of significant involvement of both lower extremities. *Id.* He asserts the RFC assessment does not consider his need to hold his cane in one upper extremity when standing or walking such that he would be unable to use that upper extremity for lifting, carrying, pushing, or pulling. *Id.* He further maintains the ALJ did not ask the VE how the loss of one hand and arm for cane use would affect the ability to perform sedentary work. *Id.* at 46. He claims the ALJ violated SSR 00-4p by relying on the VE's testimony, despite its conflict with the SSA's policies. *Id.* at 46.

The Commissioner argues Plaintiff selectively cites to the regulations and SSRs. [ECF No. 15 at 11]. He notes the regulations direct ALJ's attempting to determine if the occupational base will be eroded to consult with a VE, as the ALJ did in this case. *Id.* at 11. He insists the ALJ was not

---

[7] Neither the current version of Listing 1.00 nor the version applicable at the time of the hearing and the ALJ's decision contains a paragraph (J)(4). *See* 20 C.F.R. Part 404, Subpt. P. App'x 1 (effective May 4, 2022 to July 17, 2022); 20 C.F.R. Part 404, Subpt. P. App'x 1 (effective October 30, 2023). The language Plaintiff quotes appears in earlier versions of the listing. *See* 20 C.F.R. Part 404, Subpt. P. App'x 1 (effective May 22, 2018 to September 23, 2019).

required to specifically question the VE about Plaintiff's use of his hand to hold a cane because sedentary work primarily involves sitting to perform work tasks. *Id.* at 12. He maintains the ALJ did not violate SSR 00-4p, as it addresses the need to resolve apparent conflict between the *DOT* and the VE's testimony, and no such conflict existed. *Id.*

> The current version of Listing 1.00 provides:

> Hand-held assistive devices include walkers, canes, or crutches, which you hold onto with your hand(s) to support or aid you in walking. When you use a one-handed, hand-held assistive device (such as a cane) with one upper extremity to walk and you cannot use your other upper extremity for fine or gross movements (see 1.00E4), the need for the assistive device limits the use of both upper extremities.

20 C.F.R. Part 404 Subpt. P, App'x 1 § 1.00(C)(6)(d).

> SSR 96-9p addresses implications of an RFC for less than a full range of sedentary work. "[T]he rules in Table No. 1 in appendix 2 take administrative notice that there are approximately 200 separate unskilled sedentary occupations, each representing numerous jobs, in the national economy." SSR 96-9p, 1996 WL 374185, at *3. These 200 jobs represent the full range of sedentary work. *Id.* at *4.

> The ability to perform the full range of sedentary work requires the ability to lift no more than 10 pounds at a time and occasionally to lift or carry articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. "Occasionally" means occurring from

> very little up to one-third of the time, and would generally total
> no more than about 2 hours in an 8-hour workday. Sitting would
> generally total about 6 hours of an 8-hour workday.

SSR 96-9p, 1996 WL 374185, at *3. Thus, the full range of sedentary work requires the ability to walk and stand up to two hours in an eight-hour workday, but some sedentary jobs are available to individuals who can perform "very little" standing and walking. *See id.*

Where a claimant is unable to meet all the exertional and non-exertional requirements of sedentary work, the sedentary occupational base is considered to be eroded. *See id.* at 4. SSR 96-9p addresses several relevant areas of erosion. With respect to standing and walking, it provides:

> The full range of sedentary work requires that an individual be
> able to stand and walk for a total of approximately 2 hours
> during an 8-hour workday. If an individual can stand and walk
> for a total of slightly less than 2 hours per 8-hour workday, this,
> by itself would not cause the occupational base to be significantly
> eroded. Conversely, a limitation to standing and walking for a
> total of only a few minutes during the workday would erode the
> unskilled sedentary occupational base significantly.

*Id.* at *6. It states the following regarding use of a medically-required hand-held assistive device: "[T]he occupational base for an individual who must use such a device for balance because of significant involvement of both lower extremities (e.g., because of a neurological impairment) may be significantly eroded." *Id.* at *7.

ALJs are required to "[i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs or [vocational

specialists ("VSs"] and information in the *Dictionary of Occupational Titles* (*DOT*), including its companion publication, the *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* (*SCO*) . . . and Explain in the determination or decision how any conflict that has been identified was resolved." SSR 00-4p, 2000 WL 1898704, at *1. "SSA adjudicators may not rely on evidence provided by a VE, VS, or other reliable source of occupational information if that evidence is based on underlying assumptions or definitions that are inconsistent with our regulatory policies or definitions." *Id.* at *3.

During the hearing, the ALJ asked the VE to consider an individual limited to work at the sedentary exertional level who would require the use of a hand-held assistive device for balance and all ambulation, in addition to the other restrictions previously identified. Tr. at 1015–16, 1021, 1025. The VE testified the individual could perform jobs as a scaler, a telephone order clerk, and an information clerk. Tr. at 1021–22.

Plaintiff's counsel emphasized that sedentary work was "defined as requiring no more than two hours of standing or walking in an eight hour day," Tr. at 1030. She asked: "[I]f in fact the individual could not stand and walk cumulatively up to that two hours a day" would it "be possible they could not perform sedentary work?" *Id.* The VE responded that the individual

would still be able to perform the jobs she identified because she had identified jobs that an individual in a wheelchair could perform. *Id.*

The ALJ found Plaintiff had the RFC to perform sedentary work with additional restrictions, including, as relevant to Plaintiff's argument, "standing and/or walking for two hours in an 8-hour workday" and "would need a hand held assistive device in the nature of a cane for all ambulation, for ascending or descending slopes or traversing over uneven terrain, as well as for the purpose of maintaining balance." Tr. at 953. He determined Plaintiff could perform work as a sealer, a telephone order clerk, and an information clerk. Tr. at 958.

The court rejects Plaintiff's arguments because the applicable regulations and rulings do not equate an erosion of the sedentary occupational base to a finding of disability. SSR 96-9p provides:

> [A] finding that an individual has the ability to do less than a full range of sedentary work does not necessarily equate with a decision of "disabled." If the performance of past relevant work is precluded by an RFC for less than the full range of sedentary work, consideration must still be given to whether there is other work in the national economy that the individual is able to do, considering age, education, and work experience.

SSR 96-9p, 1997 WL 374185, at *1. It further indicates:

> When there is a reduction in an individual's exertional or nonexertional capacity so that he or she is unable to perform substantially all of the occupations administratively noticed in Table No. 1, the individual will be unable to perform the full range of sedentary work; the occupational base will be "eroded" by the additional limitations or restrictions. However, the mere

> inability to perform substantially all sedentary unskilled occupations does not equate with a finding of disability. There may be a number of occupations from the approximately 200 occupations administratively noticed, and jobs that exist in significant numbers, that an individual may still be able to perform even with a sedentary occupational base that has been eroded.

*Id.* at *4.

Where the sedentary occupational base is eroded, the adjudicator should obtain additional information from a VE. SSR 96-9p dictates:

> Whether the individual will be able to make an adjustment to other work requires adjudicative judgment regarding factors such as the type and extent of the individual's limitations or restrictions and the extent to the erosion of the occupational base; i.e. the impact of the limitations or restrictions on the number of sedentary unskilled occupations or the total number of jobs to which the individual may be able to adjust, considering his or her age, education, and work experience, including any transferable skills or education providing for direct entry into skilled work. Where there is more than a slight impact on the individual's ability to perform the full range of sedentary work, if the adjudicator finds that the individual is able to do other work, the adjudicator must cite examples of occupations or jobs the individual can do and provide a statement of the incidence of such work in the region where the individual resides or in several regions of the country.

*Id.* at *5. With respect to standing and walking limitations, it states: "For individuals able to stand and walk in between the slightly less than 2 hours and only a few minutes, it may be appropriate to consult a vocational resource." *Id.* at *6. In addressing a claimant's use of a medically-required hand-held assistive device, it notes: "In these situations, too, it may be especially useful to consult a vocational resource in order to make a judgment

regarding the individual's ability to make an adjustment to other work." *Id.* at *7.

Contrary to Plaintiff's allegation, the VE was provided with his complete limitations. The ALJ specified the hypothetical individual would be limited to work at the sedentary exertional level and would require a hand-held assistive device for balance and ambulation, in addition to the other provisions noted in the ALJ's findings of fact above. Tr. at 1025. It logically flows that an individual who requires a hand-held assistive device for balance and ambulation would have to use one of his hands to hold that device when balancing or ambulating. Therefore, a separate provision in the RFC assessment for "loss of the use of one hand/arm when standing or walking" would have been duplicative.

Plaintiff also misrepresents the VE's testimony in indicating "[t]he VE testified . . . that the use of a handheld assistive device had no impact on sedentary work." [ECF No. 10 at 46]. In fact, the VE testified the use of a handheld assistive device had no impact on the specific jobs she had previously identified in response to prior hypothetical questions. Tr. at 1021–25. As discussed above, the jobs the VE identified represented less than the full range of sedentary work.

The VE did not offer evidence that was based on underlying assumptions or definitions that were inconsistent with regulatory policies or

definitions. SSR 00-4p provides: "Although there may be a reason for classifying the exertional demands of an occupation (as generally performed) differently than the *DOT* (e.g., based on other reliable occupational information), the regulatory definitions of exertional levels are controlling." SSR 00-4p, 2000 WL 1898704, at *3. In response to the ALJ's question, the VE confirmed that any "variance off of the physical demand levels as defined in the *DOT* and its companion publications" had been based on her training, education, and work experience. Tr. at 1026. However, the jobs the VE identified as sedentary were also classified as sedentary in the *DOT*. Thus, she did not deviate from the regulatory definition of the sedentary exertional level. Her only testimony as to deviation was within the context of erosion of the sedentary occupational base, which is contemplated by SSR 96-9p and was adequately explained in her testimony. Therefore, the ALJ complied with SSR 00-4p in accepting the VE's testimony.

The court appreciates that the sedentary occupational base was eroded by the provision for use of a cane,[8] but the ALJ followed the direction in SSR

---

[8] The ALJ presented a hypothetical question in which he asked the VE to consider that the individual would have a cumulative and consistent ability to stand and/or walk for no greater than one hour in an eight-hour day. Tr. at 1026. The VE testified the individual would be able to perform the same jobs existing in the same numbers as those that could be performed by an individual requiring a hand-held assistive device for balance and all ambulation. *Id.* Despite asking this question, the ALJ ultimately assessed an RFC for standing and/or walking for two hours in an eight-hour workday. *See* Tr. at 953. Because the ALJ did not limit Plaintiff to a reduced period of

96-9p in considering the erosion. He obtained testimony from a VE, cited examples of occupations Plaintiff could perform given the limitations and indicated the incidence of such work in the economy. In light of the foregoing, the undersigned finds the ALJ considered Plaintiff's cane use as required by the relevant regulations and SSRs and substantial evidence supports his conclusion.

### 3.    Effects of Obesity

Plaintiff argues the ALJ was required to analyze the effects of obesity on his RFC in accordance with SSR 19-2p. [ECF No. 10 at 47–49]. He specifically asserts the ALJ failed to consider obesity-related limitations in his fatigue and ability to sustain function over time or in his ability to perform exertional functions. *Id.* at 48, 49.

The Commissioner argues the ALJ considered obesity in accordance with the SSR and concluded "obesity, in combination with the other impairments, limited Plaintiff to performing work within the assigned residual functional capacity." [ECF No. 14 at 12]. He contends the ALJ implicitly considered obesity in relying on opinions of physicians and a

---

standing and walking, it is unnecessary for the court to consider whether the sedentary occupational base was further eroded as to standing and walking. Nevertheless, the ALJ recognized no further erosion of the sedentary occupational base would occur, as he noted the VE's testimony that "if the residual functional capacity were reduced to include standing and/or walking only 1 hour in an 8-hour workday, the claimant could still perform the cited jobs in the same numbers." Tr. at 958.

physical therapist who were aware of Plaintiff's obesity and concluded he could perform light duty and sedentary work. *Id.* at 13.

SSR 19-2p "provides guidance on how [the SSA] establish[es] that a person has a medically determinable impairment of obesity and how [it] evaluate[s] obesity in disability claims." SSR 19-2p, 2019 WL 2374244, at *1. "Obesity is not a listed impairment; however, the functional limitations caused by the [medically-determinable impairment] of obesity, alone or in combination with other impairment(s), may medically equal a listing." *Id.* at *4. If an individual has a medically-determinable impairment of obesity that does not medically equal a listing, the ALJ is to "consider the limiting effects of obesity when assessing [his] RFC." *Id.* The ALJ must consider "the effect obesity has upon the person's ability to perform routine movement and necessary physical activity within the work environment." *Id.* Obesity, in combination with one or more other impairments, may create greater functional limitations than each of the impairments considered separately. *Id.* The SSR provides examples such as a combination of obesity and sleep apnea causing increased fatigue and a combination of obesity and arthritis causing more pain and functional limitations to a weight-bearing joint than arthritis alone. *Id.*

The ALJ considered obesity to be among Plaintiff's severe impairments. Tr. at 938, 949. He addressed obesity at step three, writing:

> Although there is no listing for obesity, the undersigned finds that there is no impairment that, in combination with obesity, meets the requirements of a listing. Based on the information in the case record, the claimant's obesity did not increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing. Further, there is insufficient evidence to support a finding that the claimant's obesity, by itself or in combination with other impairments, was medically equivalent to a listed impairment (SSR 19-2p).

Tr. at 950.

Although the ALJ did not address the effects of obesity in explaining the RFC assessment for the period beginning June 22, 2018, he specifically addressed the impairment in explaining Plaintiff's RFC for the period prior to June 22, 2018. He wrote:

> The claimant is also obese with a BMI of 47.63 as of December 2017 (Exhibit 31F/11). Pursuant to Social Security Ruling 19-2p, the undersigned has considered the limiting effects of obesity in assessing claimant's residual functional capacity. As such, the undersigned has considered whether obesity imposed any exertional, postural, manipulative, or environmental limitations; whether obesity and/or obesity-related fatigue affects claimant's physical and/or mental ability to sustain work activity; and whether the combined effects of obesity with any other impairment(s) may be greater than the effects of each of the impairments considered separately. The evidence as a whole supports a conclusion that obesity, in combination with other impairments, limits claimant to performing work within the assigned residual functional capacity.

Tr. at 945.

The ALJ considered Plaintiff's obesity in accordance with SSR 19-2p. He explicitly found that obesity, in combination with Plaintiff's other

impairments, did not meet or equal a listing. *See* Tr. at 950. Plaintiff presents no argument to counter this conclusion.

Because the ALJ found Plaintiff had the same severe impairments prior to and beginning June 22, 2018, and because the record does not indicate any significant increase in Plaintiff's BMI after that date, the undersigned considers the explanation for the consideration of obesity in the RFC assessment to apply to both periods. *See* Tr. at 949 ("the claimant's current severe impairments are the same as that present from January 25, 2017, through June 21, 2018"), 392 (BMI of 47 kg/m$^2$ in February 2017); 1446 (BMI of 45 kg/m$^2$ in July 2020), 1466 (BMI of 43 kg/m$^2$ in December 2020). The ALJ indicated he had considered Plaintiff's obesity in combination with his other impairments and had accommodated the functional effects of the combination of impairments in the RFC assessment. Tr. at 945. Although the ALJ recognized the potential for obesity-related fatigue, he did not indicate a need for further limitations in the RFC assessment to accommodate it. *See id.* Contrary to Plaintiff's assertion, SSR 19-2p did not require the ALJ to address each exertional and non-exertional function and explain how he considered Plaintiff's obesity with respect to each.

Given the ALJ's explanation, the undersigned finds he complied with the requirements of SSR 19-2p in evaluating the functional effects of Plaintiff's obesity in combination with his other impairments.

4.    Mental Limitations in Hypothetical Question to VE

Plaintiff argues the ALJ presented an improper hypothetical question to the VE because it did not cover all of his mental limitations. [ECF No. 10 at 49]. He maintains the hypothetical question "was incomplete because the Commissioner failed in finding that the Plaintiff had experienced medical improvement in concentration, persistence, or maintaining pace or adapting and managing himself when determining the Plaintiff's residual functional capacity." *Id.*

Plaintiff fails to specify the limitations, as supported in the record, that the ALJ failed to include in the hypothetical question he presented to the VE. *Id.* at 49–50. Having found substantial evidence supported the ALJ's finding of medical improvement, the undersigned rejects Plaintiff's argument as a rehashing of the medical improvement issue decided above.

III.    Conclusion

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether his decision is supported as a matter of fact and law. Based on the foregoing, the undersigned affirms the Commissioner's decision.

IT IS SO ORDERED.

*Shiva V. Hodges*

February 7, 2024
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge

75